IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 07 CV 2149 |
| v. | ) ) | Judge Joan H. Lefkow |
| MIDWEST FREIGHTWAYS, INC., a Delaware corporation; K&R LOGISTICS, INC., a Delaware corporation; MIDWEST ONE DISTRIBUTION, CO., an Illinois corporation; BIG LAKE TRANSPORT, INC., a Delaware corporation; BIG LAKE LOGISTICS, INC., a Delaware corporation; MIDWEST FREIGHTWAYS AIRCRAFT LEASING INC., an Illinois corporation; LONDON PROPERTY, L.L.C., a Delaware limited liability company; LONDON-CHARLESTON, L.L.C., a Delaware limited liability company; LONDON-LAREDO, L.L.C., a Delaware limited liability company; LONDON BOLINGBROOK, L.L.C., a Delaware limited liability company; AIR MIDWEST, L.L.C., an Illinois limited liability company; RECON CONTAINER YARD, INC., an Illinois corporation; LONDON TEXAS PARTNERS, L.P., a Delaware limited partnership; LONDON LAGRANGE, L.L.C., an Illinois limited liability company; SAVOY LOGISTICS, L.L.C., an Illinois limited liability company; DOUBLE R EQUIPMENT LEASING, L.L.C., an Illinois limited liability company and ROBERT M. ROGULIC, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

# MEMORANDUM OPINION AND ORDER

In this action Plaintiff, Central States, Southeast and Southwest Areas Pension Fund ("the Pension Fund"), filed a complaint against defendants to collect the net proceeds of real estate leasing activity pursuant to a settlement agreement concerning a prior case. Jurisdiction is correctly based in diversity, 28 U.S.C. § 1332, as none of the trustees of the Pension Fund is a citizen of the same state as any defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. Before the court are the parties' cross motions for summary judgment. For the following reasons, plaintiff's motion for summary judgment [#51] will be granted and defendants' motion for summary judgment [#54] will be denied.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the pleadings, depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to

create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## BACKGROUND[1]

In April 2005, the Pension Fund filed case No. 05 C 1949 ("the Preceding Lawsuit") in the Northern District of Illinois against certain of the defendants to collect $13,907,192.10 in withdrawal liability incurred by an employer as a result of a withdrawal from a multi-employer pension plan, as well as interest and statutory penalties. In October 2005, the court entered a stipulated preliminary injunction which required the defendants in the lawsuit to remit more than $2 million in past due withdrawal liability payments and to timely pay all future interim withdrawal liability payments. In July 2006, the Pension Fund and defendants entered into a written settlement agreement to resolve the Pension Fund's claims in the Preceding Lawsuit.

Before reaching that agreement, the parties exchanged various drafts. Of particular relevance to this lawsuit, the parties negotiated a provision whereby defendants would annually pay to the Pension Fund the Net Proceeds from the previous year's leasing of five specific parcels of real property (hereinafter referred to as "the Properties"). In response to the Pension Fund's initial draft of the settlement agreement, defendants provided a marked-up draft of the agreement in which defendants proposed being permitted to deduct from total proceeds (in order to calculate Net Proceeds) "capital improvements," "reasonable management fees not to exceed six percent of the gross rental proceeds," and "any other reasonable and necessary costs and

---

[1] Unless otherwise noted, all parties have admitted the following facts.

expenses of operating and managing the Properties." Defs.' Resp. to Pl.'s SoF ¶ 10. The Pension Fund rejected these proposed deductions, although it ultimately agreed to allow defendants to deduct a reduced amount for management fees.

The parties' written settlement agreement ("the Agreement") provides that it was entered into in Illinois and that it would be "construed and interpreted in accordance" with Illinois law. Defs.' Resp. to Pl.'s SoF ¶ 14. Pursuant to the terms of the Agreement, defendants paid the Pension Fund $1,273,572.66. Defendants also agreed to remit "Additional Consideration to the Pension Fund. *Id.* ¶ 16. Specifically, defendants agreed to "pay or cause to be paid to the Pension Fund 60 percent of the Net Proceeds" from the Properties, as well as certain Net Proceeds with respect to the sales of the properties. *Id.* Paragraph 2(b) of the Agreement defines Net Proceeds as follows:

> Net Proceeds with respect to the lease of the Properties shall mean all proceeds generated on or after January 1, 2006, from any such lease, less any reasonable and necessary costs incurred in the lease of the Properties, including (i) mortgage payments; (ii) direct costs of maintaining the Properties (and buildings and appurtenances thereon), provided that the lessor is responsible for paying such costs under any lease; (iii) insurance; (iv) real estate taxes required to be paid by the lessor under the lease; (vi) [*sic*] utilities required to be paid by the lessor under the lease; [and] (vi) management fees actually incurred, but not to exceed the lesser amount of $32,500 or 2% of the total revenues from all leases for the relevant year . . . .

Pl.'s SoF ¶ 17; Pl.'s SoF, Ex. 4 ( pt. 1 of 4), Ex. A, at 6.

The Agreement required defendants to provide the Pension Fund with an annual accounting "beginning on January 15, 2007 and continuing on each January 15 thereafter," establishing the Net Proceeds due to the Pension Fund each year. *Id.* ¶ 18. The Agreement further required defendants to pay such amounts to the Pension Fund within seven days after the combined accounting was approved by the parties.

4

In 2007, defendants provided the Pension Fund with the accounting of Net Proceeds due to the Pension relating to leasing activity in 2006. The Pension Fund and defendants were not able to agree, however, on the Net Proceeds, and the Pension Fund then demanded that defendants pay certain Net Proceeds to the Pension Fund. Defendants have not remitted any Net Proceeds to the Pension Fund with respect to leasing activity in 2006.

Defendants argue that there were no Net Proceeds due to the Pension Fund for 2006, claiming that the "reasonable and necessary costs incurred in the lease of the Properties" exceeded the total lease proceeds. *Id.* ¶ 23. Among the items that defendants argue constitute "reasonable and necessary costs incurred in the lease of the Properties" for 2006 is depreciation with respect to the Properties in the amount $377,264.00." *Id.* ¶ 24.

The Pension Fund argues that depreciation does not constitute a "reasonable and necessary cost" under the terms of the Agreement. If the claimed $377,264.00 deduction for depreciation is added back in, the defendants would owe the Pension Fund $127,309.29 in Net Proceeds.[2][3]

---

[2] This amount was calculated by taking the negative $168,165.39 in Net Proceeds calculated by defendants, adding the claimed depreciation of $377,264.00 and an additional $3,083.55 which defendants admit they erroneously deducted when calculating Net Proceeds, and then multiplying the resulting number, $212,182.15, by 0.6 (i.e., 60%). Defs.' Resp. to Pl.'s SoF ¶ 25.

[3] Other items deducted by defendants and originally objected to by the Pension Fund, included $219,677.32 in payroll and payroll taxes, $5,224.39 in bank service charges, $5,203.44 in internet charges, $2,927.00 in real estate filing fees, $2,426.11 in mobile telephone charges and $593.00 for insurance on a security vehicle. Defs.' Statement of Additional Facts ¶ 2. Although none of these expenses are itemized in Paragraph 2(b) of the Agreement, the Pension Fund is not objecting to them and has not sought to have them added back into the accounting. *Id.* ¶ 3.

In conjunction with the settlement agreement, defendant Robert Rogulic executed a personal guarantee ("the Guaranty") in which he guaranteed "the payment and performance obligations of LTP [London Texas Partners, L.P.] with respect to the sale and/or lease of the LTP Property." *Id.* ¶ 26. The Guaranty, which stated that it was entered into in Illinois and was to be construed according to Illinois law, provided as follows:

> In the event LTP fails to fully and timely make any of the payments required under the Settlement Agreement with respect to the sale and/or lease of the LTP Property, Rogulic promises to ensure that such full payment is received by the Pension Fund within 48 hours of when he receives written notice from the Pension Fund of LTP's default. In the event that the payment is not received by the Pension Fund within such 48-hour period (and such payment is not made by LTP within the same 48-hour period), then Rogulic shall be personally liable under this Guaranty for those amounts, together with all reasonable expenses (including court costs and attorney fees) paid or incurred by the Pension Fund in endeavoring to collect such indebtedness and liabilities, or any part thereof, and the Pension Fund may immediately file suit to recover those amounts.

*Id.* ¶ 28.

On April 10, 2007, counsel for the Pension Fund provided Rogulic with written notice indicating that LTP was in default under the Agreement and requesting that Rogulic pay the Net Proceeds due to the Pension Fund pursuant to the Guaranty.

**DISCUSSION**

Both sides argue that the Agreement is unambiguous as to whether it permits defendants to deduct depreciation in calculating net proceeds due to the Pension Fund. In the Pension Fund's motion for summary judgment, it argues that (1) the Agreement clearly does not allow defendants to deduct depreciation in calculating Net Proceeds, (2) even if the Agreement is considered ambiguous, the parties' settlement negotiations shows that the parties never intended to allow a deduction for depreciation, and (3) Rogulic is personally liable under the Guaranty to the Pension Fund for the "reasonable expenses (including court costs and attorney fees) paid or

6

incurred by the Pension Fund in endeavoring to collect" the Net Proceeds. In defendants' motion for summary judgment, they argue that their calculation of the Net Proceeds was proper and no further sums are owed because (1) the Agreement makes clear that depreciation is not excluded from the definition of "reasonable and necessary costs" and (2) even if the settlement agreement is considered ambiguous, extrinsic evidence demonstrates that depreciation should be an allowable deduction.

## I. Whether "Reasonable and Necessary Costs" Include Depreciation

Under Illinois law, the court must determine the intentions of the parties from the plain language of a clear and unambiguous contract. *Kallman* v. *Radioshack Corp.*, 315 F.3d 731, 736 (7th Cir. 2002). The determination of whether a contract is ambiguous is a question of law. *Patridge* v. *J.K. Harris & Co., LLC*, 279 Fed. App'x 406, 409 (7th Cir. 2008). A contract is ambiguous if "it is reasonably or fairly susceptible to more than one interpretation." *Id.* (internal quotation marks and citations omitted). If the contract is ambiguous, the parties may submit extrinsic evidence, including evidence of their negotiations, to decipher its meaning. *Id.* Although it is generally the province of the trier to weigh the extrinsic evidence, where such is undisputed, the meaning of an ambiguous contract can be decided as a matter of law. *Id.*

Paragraph 2(b) of the Agreement provides that Net Proceeds means all proceeds generated from any leases of the properties "less any reasonable and necessary costs incurred in the lease of the Properties." Defs.' Resp. to Pl.'s SoF ¶ 17. Paragraph 2(b) further states that such reasonable and necessary costs "includ[e]" six particular items: (1) mortgage payments, (2) direct costs of maintaining the Properties, (3) insurance, (4) real estate taxes, (5) utilities, and (6) management fees.

7

The Pension Fund argues that defendants' claimed deduction of depreciation is wholly inconsistent with the intent of the parties, because all of the six expenses listed in Paragraph 2(b) constitute actual out-of-pocket expenditures and depreciation is not an out-of-pocket expenditure. The Pension Fund cites *Grevas* v. *United States Fidelity & Guaranty Co.*, 604 N.E.2d 942, 946–47, 152 Ill. 2d 407, 178 Ill. Dec. 419 (1992), where the Illinois Supreme Court stated that depreciation is merely "an accounting figure, for tax purposes" and "does not involve expenditures which reduce the cash flow of a business." *Id.* at 947. The Pension Fund also cites *Briggs* v. *Briggs*, 817 A.2d 112, 118–19, 75 Conn. App. 386 (Conn. App. Ct. 2003), where a Connecticut appellate court affirmed a lower court's ruling that depreciation could not be deducted in calculating "net revenues" because depreciation is not an out-of-pocket expense. The Pension Fund also relies on *Z.R.L. Corp.* v. *Great Central Insurance Co.*, 510 N.E.2d 102, 104, 156 Ill. App. 3d 856, 109 Ill. Dec. 481 (Ill. App. Ct. 1st Dist. 1987), where in interpreting a contract, the Illinois Appellate Court recognized the doctrine of *noscitur a sociis*—a Latin phrase which, roughly translated, means "a word is known by the company it keeps"—and stated that "words or phrases should be defined in the context of associated words or phrases." *Id.* at 104 (internal quotation marks and citations omitted).

The Pension Fund argues that the Agreement's silence with respect to depreciation is also telling of the parties' intent because, under *Ebrahim* v. *Checker Taxi Co.*, 471 N.E.2d 632, 634, 128 Ill. App. 3d 906, 84 Ill. Dec. 103 (Ill. App. Ct. 1st Dist. 1984), "[t]here is a strong presumption against provisions which could have been easily included in the instrument." *Id.* The Pension Fund thus contends that because defendants must have known that they had been claiming depreciation as a tax deduction for years but nonetheless failed to include it in the

8

Agreement, they cannot now claim that they simply assumed that the claimed depreciation expense of $377,264.00 would fall under the umbrella of "reasonable and necessary costs."

In response, defendants argue that the enumerated list of six items provides only a few examples of "reasonable and necessary costs" and doe not list every possible deduction. Defendants cite the fact that the Pension Fund has already agreed on other deductions that were not specifically identified in the Agreement, such as payroll and associated taxes, bank service charges, and internet charges. Defendants further argue that if the court applies the principle set forth in *Ebrahim*, then depreciation should be deducted because the Agreement does not specify that Net Proceeds are to be determined under a cash flow analysis.

Defendants also attempt to distinguish the cases cited by the Pension Fund. First, defendants argue that in *Grevas*, 604 N.E.2d 942, the court was analyzing business interruption insurance contracts and not the terms "Net Proceeds" or "reasonable and necessary costs." Defendants contend that because the court there was focused on the issue of whether depreciation was a "noncontinuing expense" as provided under the insurance policy, *id.* at 947, *Grevas* is inapposite to the Agreement in this case. Second, defendants suggest that *Briggs* concerned the terms "net income" and "net revenues," not "net proceeds," and that the Connecticut appellate court's focus there was on whether the trial court had been clearly erroneous in its ruling that depreciation was not an out-of-pocket for purposes of calculating net revenues, which is not at issue here.

Defendants also cite a number of cases which, they contend, support the proposition that depreciation should be deducted when determining net profits. The court finds that these cases offer little, if any, support, however, for defendants' position that depreciation is properly

9

deducted under the terms of the Agreement at issue here. First, in *Cohen Furniture Co.* v. *St. Paul Insurance Co. of Illinois*, 573 N.E.2d 851, 214 Ill. App. 3d 408, 158 Ill. Dec. 38 (Ill. App. Ct. 3d Dist. 1991), the court held that the defendant properly excluded consideration of depreciation on a destroyed building in determining the actual loss recoverable under a business interruption insurance policy (which provided for recovery of net profits plus necessary and earned expenses) because the depreciation could not continue after the building was destroyed. Second, in *Fidelity-Phenix Fire Insurance Co. of New York* v. *Benedict Coal Corp.*, 64 F.2d 347, 353 (4th Cir. 1933), which also involved a business interruption insurance policy, the court stated that "[d]epreciation on property which has been destroyed is not to be allowed as a fixed charge, even though it must be considered in estimating profits which would have been earned if the business had gone on; for manifestly property which has been destroyed cannot depreciate." Third, in *American Insurance Co.* v. *Pickering Lumber Corp.*, 87 F. Supp. 512 (N.D. Cal. 1949), another case concerning business interruption insurance, the court stated that "[i]n determining the actual loss, the defendant and the referees correctly excluded the item of depreciation on the destroyed sawmill, since this was not an item that must necessarily continue after the fire." *Id.* at 519. Finally, in *Business and Professional People for the Public Interest* v. *Illinois Commerce Commission*, 585 N.E.2d 1032, 1059, 146 Ill. 2d. 175, 166 Ill. Dec. 10 (1991), the court found that depreciation is an operating expense for purposes of determining a utility's revenue requirement in the context of a utility rate-making proceeding. *Id.*

Although there is some ambiguity as to the exact range of items that might constitute "reasonable and necessary costs," the court finds that the Agreement is unambiguous as to whether depreciation falls within that range. On the one hand, the six items listed in Paragraph

10

2(b) of the Agreement is not an exclusive of list of all "reasonable and necessary costs," as supported by the fact that the Pension Fund has not objected to the defendants' deduction of some items that are not specified in that list. On the other hand, there is little support for defendants' suggestion that the term "reasonable and necessary costs" includes any costs that are arguably reasonable and necessary. Rather, the six items identified in that list are both illustrative of what sorts of expenses constitute "reasonable and necessary costs," *see Z.R.L. Corp.*, 510 N.E.2d at 104, and, in some instances, specifically limit the scope of that term.

All of the six items listed are, as the Pension Fund argues, out-of-pocket expenses and thus fundamentally distinguishable from the depreciation claimed by defendants. The court is not persuaded by defendants' attempts to distinguish *Grevas* and *Briggs* in that respect. While those cases are not directly on point, they provide ample support for the Pension Fund's contention that depreciation is not an out-of-pocket expense but an accounting figure used for tax purposes that does not affect cash flow.

Defendants quote the Supreme Court's comment in *Massey Motors, Inc.* v. *United States*, 364 U.S. 92, 104, 80 S. Ct. 1411, 4 L. Ed. 2d 1592 (1960), that "[t]he end and purpose of it all (depreciation accounting) is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." *Id.* (quoting *Detroit Edison Co.* v. *Comm'r*, 319 U.S. 98, 101, 63 S. Ct. 902, 87 L. Ed. 1286 (1943)). On the basis of this language, defendants assert that they "simply want to deduct one of the costs used to generate proceeds from the Properties, . . . 'the subtle effects of time and use on the value' of the Properties." Defs.' Resp. to Pl.'s Mot. at 7–8. The quoted language from *Massey*, however, unambiguously refers to "the taxpayer" and was made in the context of a decision concerning tax

accounting under the Internal Revenue Code. Defendants assert that their accountant "followed Internal Revenue guidelines, the official accounting pronouncements and Generally Accepted Accounting Principles [GAAP]," Defs.' Mem. at 3, but cite no evidence that the Agreement contemplated the application of tax accounting principles or figures in calculating Net Proceeds.[4] It is also worth noting that defendants do not even contend that the claimed depreciation represents any actual loss or true economic depreciation in the value of their property, beyond its rote applicability for tax accounting purposes.

Furthermore, as the Pension Fund points out, the sixth item provides that management fees are capped at specific percentage (2% of total revenues) and dollar ($32,500 per year) thresholds and may only be deducted if they are "actually incurred." Pl.'s SoF ¶ 17. Similarly, the third and fifth items, real estate taxes and utilities, are deductible only where such costs are "required to be paid by the lessor under the lease." *Id.*

The scope of the term "reasonable and necessary costs" is thus limited, both generally and specifically, by the six enumerated items. Such costs are unambiguously restricted to out-of-pocket expenses actually incurred with respect to the lease of the Properties. The court therefore finds that depreciation does not constitute a "reasonable and necessary cost" under the terms of the Agreement and must grant the Pension Fund's motion for summary judgment as to that issue.

Additionally, even if the Agreement were ambiguous as to this issue and the court needed to consider extrinsic evidence, the parol evidence to which the parties have stipulated also indicates that the parties did not intend for "reasonable and necessary costs" to include

---

[4] Defendants argue that the Agreement "requires there to be a financial accounting," Defs.' Mem. at 6, but do not articulate why such an accounting would require the application of IRS guidelines or tax accounting figures such as depreciation.

depreciation. For example, during the parties' negotiations, the defendants initially requested that they be allowed to deduct amounts spent on "reasonable management fees not to exceed six percent of the gross rental proceeds," "capital improvements," and "any other reasonable and necessary costs of operating and managing the Properties." Defs.' Resp. to Pl.'s SoF ¶ 11. The Pension Fund rejected the latter two items outright and ultimately allowed a substantially smaller deduction for management fees (the lesser of $32,500 or 2% of total revenue). Thus, with respect to the last of those items, the Pension Fund rejected a catch-all provision which would have allowed for the deduction of "*any other* reasonable and necessary costs of operating and managing the Properties." *Id.* ¶ 11 (emphasis added). Even if such a catch-all provision had been included, moreover, it is far from clear that depreciation would have fallen within its scope.

The only extrinsic evidence that defendants have cited in support of their motion for summary judgment is the fact that their accountant relied on IRS guidelines and GAAP accounting principles in determining that depreciation should be deducted when calculating Net Proceeds. *See* Def.'s Mem. at 6–7. Defendants provide no basis, however, for their assertion that the parties contemplated, let alone intended for, the application of tax accounting principles and figures in calculating Net Proceeds.

## II. Whether Robert Rogulic Is Liable for Attorney Fees and Costs

The Pension Fund argues that Rogulic is individually liable for attorney fees and costs under the Guaranty he executed. The Guaranty provides that if LTP fails to make any of the payments required under the Agreement, he must ensure that the Pension Fund receives such payment within 48 hours of the time he receives written notice of LTP's default. If the Pension Fund fails to receive such payment with 48 hours, "Rogulic shall be personally liable under this

Guaranty for those amounts, *together with all reasonable expenses (including court costs and attorney fees) paid or incurred by the Pension Fund in endeavoring to collect such indebtedness and liabilities*, or any part thereof, and the Pension Fund may immediately file suit to recover those amounts." Defs.' Resp. to Pl.'s SoF ¶ 28 (emphasis added).

In response, defendants cite *Erlenbush* v. *Largent*, 819 N.E.2d 1186, 353 Ill. App. 3d 949, 289 Ill. Dec. 386 (Ill. App. Ct. 4th Dist. 2004), for the proposition that Illinois courts strictly construe attorney fees provisions. The provision that defendants argue should be strictly construed, however, is not the attorney fees provision in the Guaranty but paragraph 4(c) of the Agreement, which provides that "the K&R Controlled Group[5] and Rogulic shall provide the Pension Fund with a combined accounting of the rent receipts and expenses and shall pay any Net Proceeds due the Pension Fund within seven days *after this combined accounting is approved by the parties*." Pl.'s SoF, Ex. 4 ( pt. 1 of 4), Ex. A, at 8 (emphasis added). Relying on this language, defendants argue that because the combined accounting has never been approved by the parties—and, in fact, has been disapproved by the Pension Fund—LTP is not in default under the Agreement and the requirements imposed by Rogulic under the Guaranty have therefore not yet come into play.

Even if the attorney fees provision of the Guaranty is strictly construed, however, the court is not persuaded by defendants' contention that they are not yet in default. Indeed, defendants' argument suggests that they cannot be in default under the Agreement until after a court determines that they are in default and enters judgment in favor the Pension Fund. Besides

---

[5] The "K&R Controlled Group" is defined in the Agreement to include a number of companies, including LTP, that are also named as defendants in this case. Pl.'s SoF, Ex. 4 ( pt. 1 of 4), Ex. A, at 2.

14

relying on circular logic, this argument would lead to an absurd result: holding that defendants' financial obligations under the Agreement come into being only after those financial obligations have been fully litigated. *See Rubin* v. *Laser*, 703 N.E.2d 453, 459, 301 Ill. App. 3d 60, 234 Ill. Dec. 592 (Ill. App. Ct. 1st Dist. 1998) ("Courts construe contracts so as to avoid absurd results.").

Finally, defendants argue that even if the court determines that there has been a default, the Pension Fund is entitled to recover from Rogulic and LTP only the proportionate amount of fees incurred relating to LTP's default, not all of the attorney fees that the Pension Fund seeks. Defendants contend that because LTP is only one of sixteen defendants and own only one of the five properties at issue, LTP should only be responsible, at most, for one-fifth of the fees and costs incurred by the Pension Fund in this litigation. Defendants cite *Anderson* v. *Flexel, Inc.*, 47 F.3d 243, 251 (7th Cir. 1995), for the proposition that a court should apportion fees in cases involving multiple defendants. *Anderson* made clear, however, that fees should be apportioned among multiple defendants not as a general rule but "in certain circumstances." *Id.* Indeed, the Seventh Circuit found that apportionment might[6] be appropriate in that case because the plaintiff had "brought separate claims against each of the defendants." *Id.* Here, on the other hand, the Pension Fund has brought a single claim against all of the defendants, and there is no suggestion that substantially less fees would have been incurred had the Pension Fund named only LTP as a defendant.

---

[6] The Seventh Circuit instructed that, on remand, the district court should "apportion, *to the extent possible*, the fees as they relate to the individual defendants." Id. at

15

The court thus holds that Rogulic is liable under the Guaranty for attorney fees and costs of collection with respect to this litigation.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment [#51] is granted and defendants' motion for summary judgment [#54] is denied. Judgment is entered in favor of the plaintiff in the amount of $127,309.29. The plaintiff may petition for fees pursuant to Local Rule 54.3.

Dated: March 9, 2009          Enter:_____
                                                  JOAN HUMPHREY LEFKOW
                                                  United States District Judge